**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARY JO ALTIMARI,**<br>        **Plaintiff,**<br><br>        **v.**<br><br>**JOHN HANCOCK VARIABLE LIFE**<br>**INSURANCE COMPANY, et. al.,**<br>        **Defendants.** | **CIVIL ACTION NO. 02-2972** |

**M E M O R A N D U M   &   O R D E R**

Katz, S.J.                                                        **February 26, 2003**

            Plaintiff Mary Jo Altimari brings the above-titled action against John Hancock

Variable Life Insurance Company (Hancock) and First Union/Wachovia Bank (Wachovia) for

failing to pay life insurance benefits following the death of her common law husband.

Specifically, Altimari is suing Hancock for breach of contract and breach of an implied-in-fact

contract.  Altimari also alleges promissory estoppel, bad faith, unfair trade practices, fraud, and

negligent misrepresentation against both Hancock and Wachovia.  For the reasons set forth

below, the defendants' motions for summary judgment are granted.

I.                Background

            In early May 2001, a Wachovia employee solicited Altimari for life insurance

over the telephone.  When Altimari indicated some interest, the employee transferred Altimari to

another Wachovia employee named Ann Monroe.[1]  After discussing the available policies,

Altimari agreed with Monroe to apply for a $500,000 insurance policy through John Hancock on

---

[1] Monroe, based in Charlotte, North Carolina, was licensed to sell like insurance
for various insurers in thirteen states including Pennsylvania.

her common law husband Brian Batchelor.  Altimari provided information to Monroe over the phone,[2] and Monroe forwarded the application to Batchelor for his review and signature. However, Monroe failed to record answers to the questions on pages three and four of the application in the section titled "Part B Statements to the Company's Agent" and instead wrote "N/A" in the margins.  These questions concerned the applicant's health history and inquired as to whether the applicant had been hospitalized in the past five years or suffered from any diseases.

On May 15, 2001, Batchelor signed the application and sent it to Monroe, along with a $49.99 check made out to John Hancock.  Batchelor neglected to answer the questions in Part B as well and failed to disclose that he had sought treatment in the emergency room at Frankford Hospital for severe abdominal pain on January 17, 2001, February 4, 2001, and April 13, 2001.  Def. Wachovia's Mot. for Summ. J, exhs. E, F, G.  On the same day he signed the application, Batchelor met with a portamedic who obtained a saliva sample.  Def. Hancock's Mot. for Summ. J., exh. D.  As part of the application process, Batchelor authorized an automatic deduction from his checking account for the monthly insurance premiums and indicated that his desired start date was "ASAP."  Id. at exh. C.  On May 23, 2001, Monroe received the application, witnessed Batchelor's signature, and forwarded the application to Hancock's home offices.  On May 29, 2001, Batchelor again visited the emergency room at Frankford Hospital complaining of severe abdominal pain and a 35 pound weight loss over the previous two months. Def. Wachovia's Mot. for Summ. J, exh H.

On June 1, 2001, Patricia Duggan, an underwriter at Hancock received Batchelor's application.  On the same date, Duggan faxed a "life underwriting sheet" to Monroe noting that

---

[2]  Monroe never personally met either Altimari or Batchelor.

three items needed immediate attention before Hancock could process the application.

Specifically, Duggan requested that Wachovia submit a Super Preferred Term Checklist,[3] that

Batchelor undergo a paramedical examination, and that Batchelor answer all questions on pages

3 and 4 of the application which were initially left blank.  Def. Hancock's Mot. for Summ. J.,

exh. F. On June 15, 2001, Wachovia employee Macie Caldwell sent an email to Duggan

inquiring about the status of Batchelor's application.  Duggan replied to the email by again

requesting the three pieces of information that were missing from Batchelor's application.  Id. at

exh. H.  After receiving the Super Preferred Term Checklist on July 6, 2001, Duggan faxed

another "life underwriting sheet" to Wachovia and Monroe stating that the "[f]ile will be

[incompleted] 7/27/01 if the paramed and the rest of the unanswered questions are not received."

Id. at exh. J.  During a series of conversations in June and July, 2001, Monroe assured Altimari

that Bathelor's life insurance application was approved, and that the only reason for the delay in

processing his application was "routine administrative bottleneck."  Id. at exh. Q, pg. 11-14, 96.

During one conversation in early July 2001, Monroe allegedly told Altimari that "technically, as

long as Batchelor doesn't commit suicide or go bungee jumping, he's covered."  Id.  Despite

Monroe's assurances, on July, 27, 2001, Duggan issued a letter to Batchelor which stated:

>           Thank you for the confidence you have placed in our company by
>           applying to us for insurance.  We are not able to continue
>           consideration of your application since we have not received
>           requested Paramed and information from your agent.

Id. at exh. K.  On August 2, 2001, Hancock issued a check in the amount of $49.99 and mailed it

to Batchelor.  Also on August 2, 2001, Batchelor went to the emergency room at Frankford

---

[3] This checklist is a list of medical questions that marketing representatives ask
applicants during the initial phone interview.

Hospital and reported that he had been coughing for about three weeks and had recently coughed up blood. Def. Wachovia's Mot. for Summ. J, exh. T1. On that date, Batchelor and Altimari learned for the first time that Batchelor had pancreatic cancer.

On August 3, 2001, Wachovia employee Vivian Wallace telephoned Duggan regarding Batchelor's application and then faxed answers to some of the unanswered questions. Def. Hancock's Mot. for Summ. J., exh. N. In response, Duggan faxed a Life Underwriting Sheet to Wallace later that day stating:

> I [have] been requesting the outstanding paramed [examination] since the first day this app [sic] arrived in underwriting 6/1/01.
> Basically this is an age/amt requirement but the rep had the option of performing the oral test and if that was the case then the paramed would have been waived and we would have gone with the non-med section on the app [sic] being used, but in this case the rep also did not complete the non-med section. . . .
> Vivian, this file has been closed and [we] will be happy to reopen when we received the paramed.

Exh. O. This was the last communication between Duggan and Wachovia regarding Batchelor's application.

After this communication, Monroe ordered a paramedical examination. On August 14, 2001, Batchelor underwent this examination. When asked whether he had a history of cancer, Batchelor answered that he did not. Id. at exh. P. Batchelor also failed to inform the paramedic that he had received treatment in the Frankford Hospital Emergency room in early 2001. Wachovia never forwarded the information obtained in the paramedical exam to John Hancock. Batchelor died of pancreatic cancer on September 8, 2001.

4

II.                    Terms of Application

           The relevant portions of John Hancock's Term Life Insurance Application are as

follows:

           This application is to:      _____ John Hancock Life Insurance Company or
           (check one)                _____ John Hancock Variable Life Insurance Company

1.      Please print all answers legibly in black ink.

2.      Any change or deletions must be initialed by the Proposed Insured or
Applicant.

3.      Part B must be completed on the Proposed Insured unless a medical
examination is required.

. . .

A.      Parts A and B of the attached application will form the basis and be part of
any new policy or additional benefit issued on the basis of this application.

B.      Coverage will take effect as provided in and subject to the terms and
conditions of Conditional Temporary Insurance Agreement on pages 5 and
6 bearing the same date and number of Part A of this application if:

     (1)      an advance payment of at least the Minimum Temporary
Insurance Premium is made with Part M of this application
which satisfies the requirements of such Conditional
Temporary Insurance Agreement; and

     (2)      the amount applied for in this and all other applications for
life insurance on the Proposed Insured now pending with
John Hancock Life Insurance Company and John Hancock
Variable Life Insurance Company does not exceed
$1,000,000.

C.      In cases other than those described in B above, any new policy of Benefit
will take effect as of the Date of Issue of the policy, but:

     (1)      only on delivery to and receipt by the Applicant of the
policy and payment of the minimum initial premium
thereon and

     (2)      only if, at the time of such delivery and payment, the
Proposed Insured is living and has not consulted or been
examined or treated by a physician or practitioner since the
latest Part B pertaining to the Proposed Insured was
completed.

D.      No agent or medical examiner is authorized to make or discharge contracts
or waive or change any of the conditions or visions of any application,
policy, or receipt, or to accept risks or pass on insurability.  Any such
unauthorized action is not notice to or knowledge of the Company.  A
medical examiner is not an agent of the Company.

. . .

Conditions of Temporary Insurance Coverage
1)      The amount received by the Company must be at least the Minimum
        Temporary Insurance Premium; and
2)      Parts A and B of the application and any required medical examinations
        and tests must be completed; and
3)      The following questions are answered "NO."
        a.              In the past 2 years, has the Proposed Insured consulted a
                        physician, been diagnosed with, or had treatment for heart
                        disease, stroke, or cancer? _____ Yes _____ No
        b.              Has the Proposed Insured been hospitalized within the past
                        6 months or been advised by a physician that he or she
                        _____[4] hospitalization for any reason (other than
                        normal pregnancy)? _____ Yes _____ No
        c.              Within the past 5 years has the Proposed Insured received
                        counseling or treatment regarding the use of alcohol, drugs,
                        or any illegal drug or controlled substance? _____ Yes
                        _____ No
        d.              In the past 3 tears, has the Proposed Insured had a driving
                        license suspended or revoked? _____ Yes _____ No

Commencement of Temporary Insurance Coverage
        If the above Conditions of Temporary Insurance are met, coverage will
take effect "Completion Date" of the Proposed Insured.  The Proposed Insured
"Completion Date will be the latest date of completion of Parts A and B of the
application and any medical examinations and tests required by the Company and
published initial underwriting requirements, according to the age of the Proposed
Insured and the amount of insurance applied for.

Amount of Temporary Insurance Coverage.  The Amount of Coverage will be
lesser of: 1)the amount applied for on the Proposed Insured, and 2) $250,000.
However, the amount of coverage will never exceed $250,000 less the total of all
amount able under all conditional temporary insurance agreements by John
Hancock Life Insurance Company or John Hancock Variable Life Insurance
Company in connection with any insurance application pending on the Proposed
Insured as of this date.

Termination of Temporary Insurance Coverage.  The conditional temporary
insurance coverage provided by this Agreement end (sic) on the earliest of:

---

        [4] The photocopied application submitted as exhibit B to Defendant John
Hancock's Motion for Summary Judgment is illegible at this point.

6

1) The commencement of coverage under the policy issued on the basis of the application.
2) The date the Applicant refuses to accept the policy as offered for delivery.
3) The date the application is declined or deemed declined. (The Application is deemed declined if not approved within 6 of the Completion Date.) Notice of any such declination will be furnished.  If termination occurs under 2) or 3) above, the amount paid will be returned or surrender of this Receipt.  In no event will _____[5] under both this Conditional Temporary Insurance Agreement and any policy issued on the basis of this application, an amendment thereto, with the same date and number as this Receipt and Conditional Temporary Insurance Agreement.

II.            Discussion

     Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter.  Rather, it determines whether or not there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249  (1986).  In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party.  Id. at 256.

     The moving party has the burden of showing there are no genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mathews v. Lancaster General Hosp., 87 F.3d 624, 639 (3d Cir. 1996).  In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings.  Anderson, 477 U.S. at 249; Celotex, 477 U.S. at 325;

_____

[5] This portion of the sentence is illegible in Batchelor's life insurance application.

Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant. Liberty Lobby, 477 U.S. at 252. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

              A.    Breach of Contract

        Under Pennsylvania Law,[6]  the terms of an insurance policy govern the rights and obligations of the parties. McDivitt v. Pymatuning Mutual Fire Insurance Company, 521 A.2d 920 (Pa. 1987). "When policy language is clear and unambiguous, the court must give effect to the language of the contract. . . . Also, the words of the insurance policy must be construed in their natural, plain, and ordinary sense." Riccio v. American Republic Ins. Co., 705 A.2d 422, 426 (Pa. 1997). If policy language is ambiguous, then the ambiguous terms should be construed against the insurer. Id. "[A] term is ambiguous only if 'reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning.'" United States Auto. Assoc. v. Elitzky, 517 A.2d 982, 986 (Pa. Super. Ct.1986) (quoting Erie Ins. Exch. v. Transamerica Ins. Co., 507 A.2d 389, 392 (Pa. Super. Ct.1986)). Furthermore, "the parties' true intent must be determined not only from the language but from all the surrounding circumstances." Id. (punctuation omitted).

        In addition, Pennsylvania case law "dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." Reliance Insurance

_____

        [6] The parties agree that Pennsylvania law governs.

Company v. Moessner, 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted).   The Pennsylvania

Supreme Court first acknowledged the "reasonable expectation" doctrine in Collister v.

Nationwide Life Insurance Co., 479 Pa. 579, 388 A.2d 1346 (1978).  In Collister, the plaintiff's

husband applied for life insurance  and had submitted a two month premium payment on a life

insurance policy in the amount of $60.66 with his application on September 24, 1972.  On

November 4, 1972, the plaintiff's husband was killed in an automobile accident.  At the time of

the accident, Nationwide Life Insurance had neither issued the policy nor had it rejected the

application.  Nationwide denied liability and argued that certain conditions contained in the

application had not been fulfilled by the applicant prior to his death - specifically, the applicant's

medical exam.  However, the Pennsylvania Supreme Court found that the insurance company's

acceptance of the application and first premium payment "created a temporary insurance contract

that provided insurance coverage for the period of time extending from acceptance of the

premium deposit until Nationwide either rejected the application because of the applicant's

uninsurability or accepted the application and issued the policy applied for."  Collister, 388 A.2d

at 1348.  The Pennsylvania Supreme Court further explained the rationale behind the reasonable

expectation doctrine in Tonkovic v. State Farm Mutual Automobile Insurance Co., 513 Pa. 445,

521 A.2d 920 (1987), when it wrote:

> [R]egardless of the ambiguity, or lack thereof, inherent in a given
> set of insurance documents (whether they be applications,
> conditional receipts, riders, policies, or whatever), the public has a
> right to expect that they will receive something of comparable
> value in return for the premium paid. Courts should also keep alert
> to the fact that the expectations of the insured are in large measure
> created by the insurance industry itself. Through the use of lengthy,
> complex, and cumbersomely written applications, conditional
> receipts, riders, and policies, to name just a few, the insurance

9

industry forces the insurance consumer to rely upon the oral
representations of the insurance agent. Such representations may or
may not accurately reflect the contents of the written document and
therefore the insurer is often in a position to reap the benefit of the
insured's lack of understanding of the transaction.

Tonkovic, 521 A.2d at 926.

In this case, plaintiff argues that she is entitled to $500,000[7] because Batchelor

and Hancock entered into a contract when Hancock received Batchelor's application and the

$49.99 premium. Altimari also points to Monroe's statement that Batchelor was "technically . . .

covered" to support her argument that she and Batchelor reasonably expected Batchelor to be

covered by Hancock's Life Insurance policy. However the terms of the insurance application

simply do not support plaintiff's contention. First, the application provides that a new policy

shall "take effect as of the Date of Issue of the policy, but:

(1)     only on delivery to and receipt by the Applicant of the policy and
        payment of the minimum initial premium thereon and
(2)     only if, at the time of such delivery and payment, the Proposed
        Insured is living and has not consulted or been examined or treated
        by a physician or practitioner since the latest Part B pertaining to
        the Proposed Insured was completed.

Def. Hancock's Mot. for Summ. J., exh. B, at 4. This language unambiguously states that the

policy shall take effect only after it is delivered and received by the proposed insured. Here,

Hancock never issued the policy. Furthermore, Hancock issued a letter on July 27, 2001

informing Batchelor that the company would no longer consider his application. Unlike the

insurance company in Collister, Hancock denied Batchelor's application prior to his death and

---

[7] In her complaint, the plaintiff seeks $550,000; however, the insurance policy was
only for $500,000. The plaintiff has since conceded that the amount sought is $500,000. Def.
Hancock's Mem. in Support of Mot. for Summ. J. at 5 n.1.

returned the $49.99 premium check.  Although "the insurance industry forces the insurance

consumer to rely upon the oral representations of the insurance agent," Tonkovic, 521 A.2d at

926, and Monroe's July 2001 statement to Altimari suggests that Batchelor was covered, the July

27 letter and refund clearly informed Altimari and Batchelor that Hancock had denied Batchelor's

application.  Therefore, it was not reasonable for Altimari and Batchelor to expect insurance

coverage.

       In addition to arguing that she is entitled to the full amount under the life

insurance policy, Altimari claims in the alternative that she is entitled to $250,000 under the

Conditional Temporary Insurance Agreement.  Under the terms of Hancock's application, the

conditions of temporary insurance coverage are as follows:

    1)    The amount received by the Company must be at least the Minimum
Temporary Insurance Premium; and

    2)    Parts A and B of the application and any required medical examinations
and tests must be completed; and

    3)    The following questions are answered "NO."

        a.    In the past 2 years, has the Proposed Insured consulted a physician,
been diagnosed with, or had treatment for heart disease, stroke, or
cancer? _____ Yes _____ No

        b.    Has the Proposed Insured been hospitalized within the past 6
months or been advised by a physician that he or she _____ [8]
hospitalization for any reason (other than normal pregnancy)?
_____ Yes _____ No

        c.    Within the past 5 years has the Proposed Insured received
counseling or treatment regarding the use of alcohol, drugs, or any
illegal drug or controlled substance? _____ Yes _____ No

        d.    In the past 3 tears, has the Proposed Insured had a driving license
suspended or revoked? _____ Yes _____ No

---

[8] The photocopied application submitted as exhibit B to Defendant John
Hancock's Motion for Summary Judgment is illegible at this point.

Def. Hancock's Mot. for Summ. J., exh. B, at 4.  In addition, the application provides that

temporary insurance coverage is terminated on the earliest of:

> 1) The commencement of coverage under the policy issued on the basis of the application.
> 2) The date the Applicant refuses to accept the policy as offered for delivery.
> 3) The date the application is declined or deemed declined. (The Application is deemed declined if not approved within 6 of the Completion Date.) Notice of any such declination will be furnished.  If termination occurs under 2) or 3) above, the amount paid will be returned or surrender of this Receipt.  In no event will _____[9] under both this Conditional Temporary Insurance Agreement and any policy issued on the basis of this application, an amendment thereto, with the same date and number as this Receipt and Conditional Temporary Insurance Agreement.

Id. at 6.  Although Altimari argues that it was reasonable to expect that the temporary life

insurance was in effect due to Monroe's comments, the application provides that temporary

insurance coverage terminates when the application is denied.  As noted above, Hancock's letter

to Batchelor on July 27, 2001 stated that the application was no longer being considered.

Hancock also refunded Batchelor's $49.99 premium in early August.  It was not reasonable for

Altimari or Batchelor to expect that temporary insurance coverage was in effect after these two

events.  Futhermore, Batchelor failed to answer the medical questions posed in the temporary

insurance section of Hancock's application which was a condition precedent to temporary

coverage.  There are no genuine issues of material fact as to the breach of contract claim and

defendant Hancock is entitled to judgment as a matter of law.

### B.    Implied-in-fact contract

"A contract implied-in-fact is an actual contract which arises when parties agree

upon the obligation to be incurred, but their intention is not expressed in words and is, instead,

---

[9] This portion of the sentence is illegible in Batchelor's life insurance application.

inferred from their actions in light of the surrounding circumstances." Department of

Environmental Resources v. Winn, 142 Pa.Cmwlth. 375, *381, 597 A.2d 281, 284 n.3 (Pa.

Comm. 1991). In this case, the parties' actions do not indicate any agreement. Hancock's

application clearly outlines the terms for temporary and permanent insurance coverage. The

application states that coverage shall take effect only after the policy is delivered and received by

the applicant. In late July, Hancock informed Batchelor that it would not process his insurance

application, and Hancock refunded the $49.99 premium. There are no facts in the record that

suggest Hancock intended to enter into a contract with Batchelor despite the express terms of the

insurance application. Thus, Hancock is entitled to summary judgment on Altimari's implied-in-

fact contract claim.

        C.      Promissory Estoppel

        "The doctrine of promissory estoppel is invoked to avoid injustice by making

enforceable a promise made by one party to the other when the promisee relies on the promise

and therefore changes his position to his own detriment." Crouse v. Cyclops Industries, 560 Pa.

394, 402-03, 745 A.2d 606, 610 (Pa. 2000). Under Pennsylvania law, a plaintiff pleading

promissory estoppel must show that "1) the promisor made a promise that he should have

reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee

actually took action or refrained from taking action in reliance on the promise; and 3) injustice

can be avoided only by enforcing the promise." Id. Altimari claims that Wachovia employee and

Hancock agent Ann Monroe[10] assured her that Batchelor was covered under Hancock's life

_____

        [10] An agent may bind its principal for purposes of promissory estoppel. Universal
Computer Systems v. Medical Services Ass'n of Pa., 628 F.2d 820 (3d Cir. 1980). Wachovia
                                                                    (continued...)

insurance policy.  According to Altimari, she reasonably relied on Monroe's assurances and

refrained from obtaining life insurance through other companies to her detriment.  Therefore,

Altimari argues she is entitled to recovery of damages in the amount of $500,000.

        In order to establish liability under the theory of promissory estoppel, "[the]

promise must be of such a nature and made under such circumstances that the promisor should

reasonably anticipate that it will induce action or forebearance of a definite and substantial

character on the part of the promissee."  Universal Computer System, Inc. v. Medical Services

Association of Pennsylvania, 628 F.2d 820, 824 (3d Cir. 1980).  In response to Altimari's claims

that Monroe promised insurance coverage, the defendants first argue that Monroe never promised

Altimari that the application was approved.  Defendants point to Altimari's testimony that

Monroe "did not tell me that the policy was approved, she told me it was - she would look into it.

It was being held up due to paperwork and due to a move to another location."  Def. Hancock's

Mot. for Summ. J., Exh. Q.  Altimari also testified that "[Monroe] did inform me that the policy

should be out in a few weeks.  I did ask her, I said, 'So, between now and until I actually receive

the policy if anything should happen, would he be covered.'  She said, 'Ms. Altimari, technically,

yes.'"  Id.  The defendants contend that these statements merely suggest that the policy is still

being processed and do not constitute a promise.  According to the defendants, "[t]he uncertain

prospect of future action is not the type of definitive statement upon which promissory estoppel

can be based."  Def. Wachovia's Mot. for Summ. J. at 5 (citing Joseph's v. Pizza Hut of America,

---

[10](...continued)
argues that an agent cannot be held liable for promissory estoppel when the contract was to be
issued by the principal.  Because this court finds that the plaintiff has failed to establish the
elements of promissory estoppel, bad faith, unfair trade practices, fraud, and negligent
misrepresentation, there is no need to address this argument.

Inc., 733 F. Supp. 222 (W.D. Pa. 1989), aff'd 899 F. Supp.2d 499, 505 (E.D. Pa. 2002)).

Defendants also argue that Monroe's statements contradict the explicit language in the

application explaining the process for obtaining a Hancock policy.  Because the application

provides that "[n]o agent . . . is authorized to make or discharge contracts or waive or change any

conditions or provisions of any application . . .", Monroe could not have reasonably anticipated

that Altimari would have relied on her assurances.  See Superka v. Valley Forge Life Insurance,

44 Pa. D. & C.4th 92, 103-04 (1999) (rejecting a plaintiff's claim for promissory estoppel when

the insurance agent's statement that coverage would be effective immediately without a premium

payment directly contradicted the explicit language of the policy).  However, when viewing the

facts in the light most favorable to the plaintiff, this court finds that there exists a genuine issue

of material fact as to whether Monroe's statements constituted a promise that would have

reasonably induced reliance.  If an insurance applicant asks an insurance agent if he or she is

covered and receives the response "technically yes," the agent most likely intends for the

applicant to rely on this response and refrain from withdrawing the insurance application and

contracting with another company.  Therefore, there exists an issue of material fact as to whether

plaintiff has established the first element of promissory estoppel.

       In addition to establishing that the promissor reasonably should have known her

promise would have induced reliance, Altimari must also show that Monroe's promise actually

induced action or forbearance to Altimari's detriment.  Although Altimari asserts that Batchelor

would have contacted another insurance company had he known that Hancock had not approved

his claim, Altimari fails to offer any evidence that Batchelor would have obtained life insurance.

While the moving party bears the burden of showing that there are no material facts in dispute,

the non-movant must offer more than "a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." <u>Anderson</u>, 477 U.S. at 249; <u>Celotex</u>, 477 U.S. at 325; <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). In this case, Batchelor's physical health began deteriorating in January 2001. Batchelor visited the emergency room at Frankford Hospital five times between January and June 2001 complaining of diarrhea, severe abdominal pain, and significant weight loss. Although Batchelor may have applied to another life insurance company without Monroe's assurances, there is nothing in the record apart from plaintiff's assertions which suggests another life insurance company would have insured Batchelor. "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" <u>Cleveland v. Policy Management Systems Corp.</u>, 526 U.S. 795, 805 (1999) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Because the defendants have shown there is no genuine issue of material fact as to whether Batchelor relied on Monroe's assurances to his detriment, defendants are entitled to summary judgment on plaintiff's promissory estoppel claim.

D.    Bad Faith

Plaintiff also asserts a claim against First Union and Wachovia alleging that the defendant's violated 42 Pa. Cons. Stat. § 8371. Section 8371 provides that:

> In an action <u>arising under an insurance policy</u>, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

Id. (emphasis added).  In order to establish a claim under this statute, a plaintiff must show "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis."  Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Property & Cas. Ins. Co., 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), appeal denied, 540 Pa. 641, 659 A.2d 560(1995)).  To succeed on a section 8371 claim, the insured must establish the insurer's bad faith by "clear and convincing evidence."  Terletsky, 649 A.2d at 688.  Pennsylvania courts have applied the following definition of "bad faith" when evaluating a claim under the statute:

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

 Id. (quoting Black's Law Dictionary 139 (6th ed. 1990)).

Although plaintiff argues that this action arises under an insurance policy because defendants refuse to pay the proceeds of a life insurance policy, 42 Pa. Cons. Stat. § 8371 does not apply to conduct which occurs prior to formation of an insurance contract.  See Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F.Supp.2d 371, 385 n.20 (E.D. Pa. 1998) ("[B]ecause plaintiff's claims do not 'arise under an insurance policy' – but rather address conduct prior to formation of the insurance contract – she may not avail herself of the additional remedies provided in § 8371.").  In this case, there was no insurance policy; therefore, Hancock's refusal to pay insurance proceeds does not violate section 8371.  There are no issues of material facts, and defendants are entitled to summary judgment on plaintiff's bad faith claim.

17

E.      Unfair Trade Practices

Plaintiff also alleges that Hancock and Wachovia violated the Pennsylvania

Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1 et seq.  In her

complaint, the plaintiff alleges that Monroe "fraudulently induced Batchelor into believing he

had a life insurance policy with Hancock or deceptively created the likelihood that Batchelor

would understand that he had life insurance coverage with Hancock."  Compl. ¶ 48.  According

to the plaintiff, Hancock then "wrongfully refused to extend coverage to Batchelor, depriving

Altimari of Life insurance."  Id.

"In Pennsylvania, only malfeasance, the improper performance of a contractual

obligation, raises a cause of action under the Unfair Trade Practices and Consumer Protection

Law, 73 P.S. § 201-1 et seq., and an insurer's mere refusal to pay a claim which constitutes

nonfeasance, the failure to perform a contractual duty, is not actionable."  Horowitz v. Federal

Kemper Life Assur. Co., 57 F.3d 300, 307 (3d Cir. 1995).  Although Altimari argues that

Monroe's assurances constitute malfeasance, there is no evidence in the record to support this

allegation.  Therefore, defendants have shown there are no material facts and they are entitled to

summary judgment on this claim.

F.      Fraud

Under Pennsylvania law, the elements of fraud are: "(1) a misrepresentation; (2) a

fraudulent utterance thereof, (3) an intention by the maker to induce the recipient to act, (4)

justifiable reliance by the recipient on the misrepresentation, and (5) damage to the recipient as a

proximate result of the misrepresentation."  Mellon Bank Corp. v. First Union Real Estate Equity

and Mortgage Investments, 951 F.2d 1399, 1409 (3d Cir.1991).  Altimari alleges that the

18

defendants "knowingly, falsely and/or recklessly misrepresented . . . that Batchelor was covered with Hancock under a life insurance policy," and that Altimari and Batchelor justifiably relied on these misrepresentations and did not obtain other life insurance as a result. Compl. ¶¶ 50-53. However, as discussed above, plaintiff merely asserts that Batchelor could have obtained life insurance elsewhere. Therefore, the plaintiff suffered no damage as a proximate result of the alleged misrepresentation. Defendants have met their burden and are entitled to summary judgment on this claim.

G.    Negligent Mispresentation

In Pennsylvania, the elements for negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made under circumstances in which the speaker ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank, 801 A.2d 1248, 1252 (Pa. Super. 2002). As discussed above, Monroe's statements caused no injury to the plaintiff. Therefore, there are no issues of material fact and defendants are entitled to judgment as a matter of law on this claim.

III.    Conclusion

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARY JO ALTIMARI,**<br>        **Plaintiff,**<br><br>        **v.**<br><br>**JOHN HANCOCK VARIABLE LIFE**<br>**INSURANCE COMPANY, et. al.,**<br>        **Defendants.** | **CIVIL ACTION NO. 02-2972** |

**O R D E R**

AND NOW, this 26th day of February, 2003, upon consideration of Defendant

John Hancock's Motion for Summary Judgment, Defendant Wachovia's Motion for Summary

Judgment, the plaintiff's responses, and the replies, it is hereby **ORDERED** that the said Motions

are **GRANTED.**

BY THE COURT:

_____

**MARVIN KATZ, S.J.**